# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————

No. 18-31099

————

United States Court of Appeals
Fifth Circuit

**FILED**

December 4, 2019

Lyle W. Cayce
Clerk

ALEASHIA CLARKSTON;
KINGDOM BUILDERS COMMUNITY DEVELOPMENT CORPORATION,

Plaintiffs–Appellants,

versus

JOHN WHITE, In His Individual Capacity as
Superintendent of the Louisiana Department of Education,

Defendant–Appellee.

————

Appeal from the United States District Court
for the Middle District of Louisiana

————

ON PETITION FOR REHEARING EN BANC

Before OWEN, Chief Judge, SMITH and DENNIS, Circuit Judges.
PER CURIAM:

Treating the petition for rehearing en banc as a petition for panel rehearing, the petition for panel rehearing is DENIED. No member of the panel or judge in regular active service having requested that the court be poled on rehearing en banc (Federal Rule of Appellate Procedure 35 and Fifth Circuit Rule 35), the petition for rehearing en banc is DENIED.

No. 18-31099

The opinion issued October 25, 2019, is VACATED, and the following opinion is substituted, the only change being to add language to footnote 5:

\* \* \* \* \*

Before OWEN, Chief Judge, SMITH and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Kingdom Builders Community Development Corporation ("Kingdom Builders") and its CEO, Aleashia Clarkston, sued John White, the Superintendent of the Louisiana Department of Education ("LDOE"), alleging that White caused the denial of Kingdom Builders's charter school application in retaliation for Clarkston's expressing her views on disciplinary practices—including corporal punishment—on the nationally televised show *America's Supernanny*. Plaintiffs sought damages via a 42 U.S.C. § 1983 claim for First Amendment retaliation and a state retaliation claim per article I, section 7 of the Louisiana Constitution. The district court held that Clarkston had "failed to state a valid claim for retaliation." We affirm on a different ground.

I.

In June 2015, Kingdom Builders submitted a charter school application to the Lafayette Parish School Board, which the board denied. Plaintiffs appealed to the Louisiana Board of Elementary and Secondary Education ("BESE").[1] In connection with that appeal, the LDOE and SchoolWorks, a third-party evaluator contracted by the LDOE, evaluated plaintiffs'

---

[1] Under Louisiana law, a charter school must first submit its application to the local school board. LA. STAT. ANN. § 17:3983(A)(2)(a)(i). If the application is denied, the chartering group may appeal to the BESE. *See id.*

2

application. SchoolWorks recommended that the BESE approve the application, but the LDOE—through White—recommended that the BESE deny it.[2]

Following the conflicting reports, the BESE deferred ruling on the appeal and directed White to hire a third party to review his concerns with Clarkston's application. White contracted with Transcendent Legal to conduct that review. Transcendent Legal's report focused on "concerns specifically pertain[ing] to whether or not the proposed school leader [(Clarkston)] possesse[d] the professional judgment necessary to open and lead a high-performing charter school." Among those concerns was Clarkston's appearance on the television show *America's Supernanny*, which "caused the [LDOE] to question her professional judgment in choosing to air her family's disciplinary practices," including the use of corporal punishment, "on national television while representing herself as an educator."

Applying six norms used by the National Policy Board for Educational Administration,[3] Transcendent Legal examined Clarkston's professionalism. It concluded that she exceeded expectations for one of the professional norms, met expectations for two, and failed to meet expectations for three. Transcendent Legal recognized that "[w]ithout question, Mrs. Clarkston's deficiencies

---

[2] As Superintendent, White is responsible for "[m]ak[ing] recommendations on contracts and agreements to be entered into by the board." *Id.* § 17:22(2)(b). The BESE—not the LDOE—has the authority under state law to approve or deny a charter school application. *Id.* § 17:3983(A)(3)(c).

[3] The standards asked whether Clarkston: (1) "act[ed] professionally in personal conduct, relationships with others, decision-making, stewardship of the school's resources, and all aspects of school leadership"; (2) "act[ed] according to and promote[d] the professional norms of integrity, fairness, transparency, trust, collaboration, perseverance, learning, and continuous improvement"; (3) "place[d] children at the center of education and accept[ed] responsibility for each student's academic success and well-being"; (4) "safeguard[ed] and promote[d] the values of democracy, individual freedom and responsibility, equity, social justice, community, and diversity"; (5) "le[d] with interpersonal and communication skill, social-emotional insight, and understanding of all students' and staff members' backgrounds and cultures"; and (6) "promote[d] professional behavior among faculty and staff."

No. 18-31099

in any given norm resulted solely from Mrs. Clarkston's decision to participate in the reality show *Supernanny* and/or the related publicizing of her participation in that television show just three (3) short years ago."

In March 2016, after reviewing the evaluations of the School Board, SchoolWorks, and Transcendent Legal, the LDOE—through White—again recommended that the BESE deny plaintiffs' application. Highlighting that Transcendent Legal's "report provide[d] mixed conclusions regarding the professional judgment of the proposed school leader that neither disqualifies nor validates the Department's concerns," the LDOE emphasized that its "concerns serve not as definitive character statements, but rather as potential evidence of issues that should give BESE pause before authorizing the charter under the proposed leadership."

After hearing from the LDOE, the BESE denied plaintiffs' application. Both sides now agree that the BESE was the ultimate decisionmaker.

Plaintiffs brought claims for retaliation, alleging violations of the First and Fourteenth Amendments and article I, section 7 of the Louisiana Constitution.[4] Plaintiffs contended that White took "action against the Plaintiffs because he disagreed with opinions expressed by Mrs. Clarkston on a national television show, 'America's Supernanny,' in 2013 regarding corporal punishment of her own children." They also contended that "White's opinion and

---

[4] Article I, section 7 provides that "[n]o law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom." LA. CONST. art. I, § 7. "Louisiana's constitutional protection of free speech mirrors that of the First Amendment," *Heaney v. Roberts*, 846 F.3d 795, 801 n.2 (5th Cir. 2017), and "the Louisiana Supreme Court would recognize the same [QI] defense for claims under Article I, Section 7, that federal courts recognize for § 1983 First Amendment claims," *id.* Therefore, if "summary judgment is proper as to Plaintiffs' First Amendment claims, summary judgment is also proper on Plaintiffs' Article I, § 7 state law claims." *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 231 (5th Cir. 2016). Accordingly, the two claims are analyzed as a single issue.

No. 18-31099

recommendation to the [BESE] was a motivating factor in the Board's decision to deny Kingdom Builders' charter school application."

White moved for summary judgment, asserting, *inter alia*, the defense of qualified immunity ("QI"). The district court granted the motion and dismissed plaintiffs' claims with prejudice, finding that they had failed to state a valid retaliation claim.

II.

We affirm on a basis different from the one relied on by the district court. White is entitled to QI because, at the time of his alleged violation, it was not clearly established that First Amendment liability could attach to a public official who did not possess final decisionmaking authority. The district court did not reach the QI inquiry, but this court may affirm for any reason supported by the record, even if not relied on by the district court. *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009).

A.

Government officials "are entitled to [QI] under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the [QI] analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The plaintiff has the burden to point out the clearly established law. *Delaughter v. Woodall*, 909 F.3d 130, 139 (5th Cir. 2018). "Clearly established law is determined by controlling authority—or a robust consensus of

5

persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* (internal quotation marks omitted). "This means the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right, although it is not necessary for controlling precedent to have held that the official's exact act was unlawful." *Id.* at 139–40 (internal quotation marks omitted). Ultimately, "[t]he central concern is whether the official has fair warning that his conduct violates a constitutional right." *Id.* at 140.

## B.

We conclude, at the second prong, that the right at issue was not clearly established, so White is entitled to QI. It thus is unnecessary for us to reach the more complicated issue of whether a rights violation occurred at the first prong. *See Callahan*, 555 U.S. at 236.

At the time White allegedly violated plaintiffs' rights—March 2016, at the latest—this court's jurisprudence was ambiguous regarding whether First Amendment liability could attach to a public official who did not possess final decisionmaking authority.[5] Because White was not a final decisionmaker, it was not clearly established that he could be liable for his recommendation to the BESE. Accordingly, he is entitled to QI.

AFFIRMED.

---

[5] *See, e.g., Sims v. City of Madisonville*, 894 F.3d 632, 641 (5th Cir. 2018) (per curiam) (holding that caselaw had not clearly established "whether First Amendment liability can attach to a public official who did not make the final employment decision"); *Pennypacker v. City of Pearl*, 689 F. App'x 332, 332 (5th Cir. 2017) (per curiam) ("It is not clearly established in this circuit whether [non-final decisionmakers] may be held personally liable for First Amendment retaliation under § 1983."). To be sure, after *Sims*, the law is 'no longer . . . 'unsettled' in this area," and we know that "individual liability for a government official who violates constitutional rights, including First Amendment rights, turns on traditional tort principles of 'but-for' causation." *Sims*, 894 F.3d at 639, 641. But the QI question here turns on whether the law was clearly established.