# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 11, 2022

Lyle W. Cayce
Clerk

No. 20-40250

Terry Bevill,

*Plaintiff—Appellee*,

*versus*

Jeffrey Fletcher; Thomas Castloo, Wood County
Sheriff; James Wheeler, Former Wood County District
Attorney,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-406

Before Davis, Stewart, and Oldham, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Plaintiff-Appellee Terry Bevill alleged he was fired from the Quitman Police Department ("QPD") in retaliation for making unflattering statements about Defendants-Appellants Wood County Sheriff Tom Castloo, Wood County District Attorney James Wheeler, and Texas Judge Jeff Fletcher (collectively, "Defendants"). On motions to dismiss, the district court held that Defendants were not entitled to qualified immunity on Bevill's claim brought under 42 U.S.C. § 1983 for conspiracy to commit

retaliatory employment termination. It also concluded that Bevill plausibly averred that Defendants formed an agreement to violate one of his constitutional rights. This interlocutory appeal followed.

For the reasons that follow, we AFFIRM.

## I. BACKGROUND & PROCEDURAL HISTORY

On April 19, 2017, the *Kilgore News Herald* published an article in which Fletcher, who had recently been elected as a state judge, noted his excitement about working together with Castloo and Wheeler. In the article, Fletcher also "emphasized the importance of [he, Castloo, and Wheeler] staying in line and working in unison toward the same goals." Two months later, Bevill, then captain of QPD, filed an affidavit supporting a venue transfer for the criminal trial of former Wood County Jail Administrator David McGee. The affidavit, which was filed at the request of McGee's lawyer, stated that McGee would not receive a fair trial in Wood County for facilitating the escape of an inmate and tampering with government records because of the close personal relationships among Defendants. Specially, the affidavit stated that "[a]s a longtime resident and law enforcement officer in the Wood County area, Bevill was familiar with the local players and political climate, including the relationships between and among the sheriff, district attorney and judge." Bevill did not sign the affidavit in his capacity as an officer of QPD. Nor did Bevill "[speak] with anyone [at QPD] about the affidavit prior to signing [it]."

After learning about Bevill's affidavit, Defendants approached Quitman's mayor, David Dobbs, to discuss Bevill's continued employment with QPD. During that discussion, Defendants threatened to withhold resources from Quitman and support for QPD if Bevill was not fired because of his affidavit. Dobbs then pressured QPD Police Chief Kelly Cole to fire Bevill because of Defendants' threat. After initially objecting to Bevill's

termination, Cole placed Bevill on administrative leave and investigated whether Bevill violated any city or QPD policies. The investigation concluded that Bevill violated city policies that bar members of QPD from "seek[ing] to obtain any continuance of any trial in court out of friendship for the Defendant or otherwise interfere with the courts of justice" and "conduct[ing] themselves in a manner which . . . discredit[s] the Peace Officer profession or their employing agency." Cole then fired Bevill. Cole, along with Quitman's city secretary, Gregg Hollen, later told the Texas Workforce Commission that the decision to terminate Bevill was based in part on Wheeler's threat to not "take any more cases from the City of Quitman" unless Bevill was fired.

Following Bevill's termination, all Defendants attended a Quitman City Council meeting during which Castloo told the Council that "I understand you have taken some steps" regarding Bevill's affidavit yet "more steps need to be taken." Castloo also implored the Council "to do more to provide support to the [Wood County] DA's office, the [Wood County] Sheriff's office and . . . [Judge Fletcher's] office in this matter."

McGee's case was never transferred, and a jury found him guilty. After McGee's criminal trial concluded, Fletcher issued a warrant for Bevill's arrest for perjury, but the charge was later dismissed. Bevill averred that while the perjury charges were pending, Fletcher placed "extreme and unreasonable conditions" on Bevill's bond for the perjury charge, including (1) turning over his firearms, (2) submitting to drug testing every two weeks at personal cost to Bevill, (3) obtaining written permission from Wood County officials or Judge Fletcher before leaving the county, (4) reporting to Wood County officials every two weeks, and (5) abstaining from the consumption of alcohol. He also alleged that Wheeler "refused to bring [his perjury] case before a grand jury in an effort to prolong the pending criminal action as long as possible in retribution for the affidavit."

No. 20-40250

In the operative complaint, Bevill sued (1) Quitman and Dobbs under § 1983 for terminating his employment in retaliation for his affidavit; (2) Quitman, Dobbs, and Defendants under § 1983 for conspiring to terminate his employment in retaliation for his affidavit; (3) Wood County and Castloo under § 1983 for unconstitutional oppression, intimidation, and retaliation; and (4) Wood County and Defendants for conspiring to arrest and prosecute Bevill in retaliation for his affidavit. Castloo and Wheeler filed one motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), while Fletcher filed another. The district court concluded Defendants were not entitled to qualified immunity on Bevill's § 1983 claim for conspiracy to commit retaliatory employment termination. It also determined that Bevill plausibly averred that Defendants formed an agreement to violate his First Amendment rights.

Defendants timely noticed an interlocutory appeal.[1]

## II. STANDARD OF REVIEW

The court has appellate jurisdiction to review a district court's order denying a motion to dismiss on the basis of qualified immunity "only to the extent that the appeal concerns the purely legal question [of] whether the defendants are entitled to qualified immunity on the facts[.]" *Armstrong v. Ashley*, 918 F.3d 419, 422 (5th Cir. 2019) (alteration in original) (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc)). The court also has jurisdiction to review the sufficiency of a complaint on interlocutory appeal when that issue is "inextricably intertwined" with the denial of qualified immunity. *Ashcroft v. Iqbal*, 556 U.S. 662, 673–74 (2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)).

---

[1] The district court's disposition of Bevill's other claims are not subjects of this appeal.

No. 20-40250

When the court has jurisdiction, it reviews de novo the district court's denial of a motion to dismiss on qualified immunity grounds or for failing to state a claim, accepting all well-pleaded facts as true and viewing them in the light most favorable to the plaintiff. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008); *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010). A plaintiff seeking to overcome a motion to dismiss because of qualified immunity or for failing to state a claim must plead facts that allow the court to draw the reasonable inference that the defendant is liable for the harm alleged. *Arnold v. Williams*, 979 F.3d 262, 266–67 (5th Cir. 2020). The alleged facts must also "defeat a qualified immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

## III. DISCUSSION

"To state a claim for conspiracy under § 1983, a plaintiff must allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation." *Whisenant v. City of Haltom*, 106 F. App'x 915, 917 (5th Cir. 2004) (per curiam) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)). If qualified immunity bars Bevill's underlying First Amendment claim, "there [is] no need to reach the issue of whether a conspiracy existed to engage in those actions." *See Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995). Thus, we will begin with a discussion of whether Defendants are entitled to qualified immunity.

"Once a defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to show that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time." *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)).

As an initial matter, Bevill argues that Defendants are not entitled to qualified immunity because they were not acting within the scope of their

5

discretionary authority when they threatened to withhold resources from Quitman and support for QPD. Per *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 318 (5th Cir. 2019), Defendants "must first satisfy [their] burden[s] of establishing that the challenged conduct was within the scope of [their] discretionary authority." *Id.* at 318. "Once the defendant[s] establish[] that the challenged conduct was within the scope of [their] discretionary authority, the burden then shifts to the plaintiff to rebut the qualified immunity defense." *Id.* Officials act within the scope of their discretionary authority when they "perform[] non-ministerial acts within the boundaries of [their] official capacit[ies]." *Id.* (quoting *Cronen v. Tex. Dep't of Hum. Servs.*, 977 F.2d 934, 939 (5th Cir. 1992)).

Bevill averred that Defendants threatened to withhold resources from Quitman and support for QPD if Bevill was not fired because of his affidavit. Bevill alleged that this threat ultimately resulted in Bevill's termination. Bevill's theory of the case would be completely undermined if Defendants did not possess the discretionary authority to restrain the flow of these resources. Considering the merit of his argument nonetheless, Bevill has not shown that Defendants were acting outside of the scope of their discretionary authority when they discussed with Dobbs withholding resources from Quitman and support for QPD. Defendants, in their positions as sheriff, district attorney, and state judge, respectively, were responsible for allocating resources within the boundaries of Wood County, which includes Quitman and its police department. For instance, Wheeler contends that he was "authorized to direct resources such as assistant district attorneys and investigators to specific matters at his discretion" and to enter into agreements with QPD for the transfer of forfeited property. Moreover, Castloo asserts that he had the discretion to allocate law enforcement services to support QPD. And Fletcher contends that he had numerous administrative responsibilities, including overseeing county courts and local

departments of correction. Thus, each of the Defendants is entitled to assert a defense of qualified immunity.

*A. Violation of a Constitutional Right*

Next, we assess whether Bevill has adequately pled facts supporting the first prong of the qualified immunity analysis: a violation of his constitutional rights. We determine that he has done so.

Bevill claimed that Defendants caused Cole to fire him in retaliation for exercising a First Amendment right through submitting the affidavit. To establish a First Amendment retaliatory-discharge claim, Bevill must prove that (1) he suffered an adverse employment decision, (2) he spoke as a citizen on a matter of public concern, (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, and (4) the protected speech motivated the adverse employment action. *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007). Defendants only dispute the sufficiency of Bevill's allegations as to the second and third elements.

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "This is because the public employer, like any principal, has an interest in controlling the activities of its agents[,]" including employee speech that "contravene[s] [the public employer's] policies or impair[s] the proper performance of [its] functions." *Anderson v. Valdez*, 845 F.3d 580, 593 (5th Cir. 2016) (alterations in original) (quoting *Garcetti*, 547 U.S. at 419). "Even if the employer has such an interest, however, that interest must still be balanced against the employee's own interests: '[A] citizen who works for the government is nonetheless a citizen,' and '[t]he First Amendment limits the ability of a public employer . . . to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.'" *Id.* (alterations in original) (quoting *Garcetti*,

No. 20-40250

547 U.S. at 419). "The importance of public employee speech is especially evident in the context of . . . public corruption" since "speech by public employees regarding information learned through their employment" is the "very kind of speech necessary to" reveal malfeasance among public officials. *See Lane v. Franks*, 573 U.S. 228, 240–41 (2014).

To strike a balance of interests, the Supreme Court has directed lower courts to determine whether a public employee has made a statement "pursuant to [his or her] official duties." *Garcetti*, 547 U.S. at 421.[2] If the employee has done so, the speech is not protected under the First Amendment. *See id.* at 421–22. But if the employee has not, then the speech is protected. *See id.*

The alleged facts suggest that Bevill did not write his affidavit pursuant to an official duty. Bevill voluntarily submitted the affidavit as a friend of McGee. He alleged that he was never asked to and did not sign the affidavit in his capacity as an officer of QPD. He did not speak to anyone at QPD about the affidavit before signing it. Although Bevill may have learned about potential bias in McGee's upcoming trial through his work as a policeman, that "does not transform that speech into employee—rather than

---

[2] *Lane* states that "[t]he critical question under *Garcetti* is whether the speech at issue is itself *ordinarily* within the scope of an employee's duties . . . ." 573 U.S. at 240 (emphasis added). Although *Lane* "added 'ordinarily' to the formulation used in *Garcetti* . . . , we have since noted that, 'whatever change in the jurisprudence "ordinary" may augur, we are unable to discern any change in *Garcetti*'s rule from *Lane* . . . .'" *Anderson*, 845 F.3d at 596 (quoting *Gibson v. Kilpatrick*, 773 F.3d 661, 669 (5th Cir. 2014)).

citizen—speech." *See Lane*, 573 U.S. at 240.[3] To be sure, Defendants correctly note that Bevill "prominently presented [his] job title in his motion to transfer affidavit directly after stating his name," thereby giving his affidavit the imprimatur of his position. But that demonstrates Bevill's knowledge of the close personal relationships among Defendants, not that he spoke according to an official duty. Similarly, his belief that McGee could not receive a fair trial in Wood County was allegedly "[b]ased on his years working in law enforcement." Perhaps for these reasons, Defendants observe that "[s]ubmitting an affidavit such as this might not have been a part of [Bevill's] normal duties."

---

[3] Defendants' attempts to distinguish *Lane* are unpersuasive. First, Defendants argue that "Lane's speech was pursuant to a subpoena[,] which the Court found put him in an impossible position[,]" while Bevill "volunteered his services to assist one specific criminal defendant." But Defendants read *Lane* too narrowly. *Lane* held that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes." 573 U.S. at 238. Here, too, Bevill submitted a sworn statement. Whether Bevill submitted such a statement voluntarily or under pain of punishment is not decisive, given that the policy rationale underlying *Lane* is to incentivize public employees to come forward with truthful information about corruption among public officials. *Cf. Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 990 (3d Cir. 2014) ("While *Lane* focused on speech in the context of compelled testimony, *see* [*Lane*, 573 U.S. at 238–39], Appellants' argument that its holding is limited to that context is misguided.") (citing *Mpoy v. Rhee*, 758 F.3d 285, 294–95 (D.C. Cir. 2014)). Indeed, "[t]he Supreme Court's focus on sworn testimony was in response to the 'short shrift' the Eleventh Circuit gave to that speech." *Id.* (quoting *Lane*, 573 U.S. at 238). Defendants next contend that *Lane* is inapplicable because Bevill simply provided "unsubstantiated [*read*: untruthful] statements regarding his friend's inability to obtain a fair trial." But, as noted, at this preliminary stage of the proceedings, the court must take Bevill's allegations of bias as true. Finally, Defendants assert that "Lane's employer did not have a policy that reasonably prevented him" from speaking, while Quitman did in this case. The effect of Quitman's policies on the disposition of this appeal is discussed below. In any event, the policy rationale underlying *Lane* applies here too. "There is considerable value . . . in encouraging, rather than inhibiting, speech by public employees." *Lane*, 573 U.S. at 236.

Nevertheless, Defendants assert "there is a reason" that explains why Bevill's conduct exceeded his duties. They argue that Bevill still spoke in the capacity of an employee, rather than a citizen, because city policies prevented him from submitting the affidavit. In *Anderson*, upon which Defendants rely in support of their argument, the court observed that "[a] public employee . . . might speak pursuant to his official duties when he does so in a course of conduct subject to the employer's control, even if the employer has not actually directed him to speak, not to speak, or how to speak." 845 F.3d at 596. Because city policies controlled Bevill's right to submit an affidavit regardless of whether he voluntarily submitted it, Defendants assert, he spoke pursuant to an official duty and therefore has no viable cause of action.

We are not convinced that *Anderson*'s admonition regarding employer control applies here. *Anderson* cites "[t]he circumstances in *Garcetti*" to "illustrate this focus on whether the employer was entitled to exercise control." *Id.* There, a district attorney's office disciplined an employee for speech made pursuant to his official duties as a prosecutor. *Garcetti*, 547 U.S. at 421. "The speech, a memorandum, was made for the benefit of the employer. It was, in essence, the employer's speech, not the employee's own. The employer, not the employee, was entitled to control it." *Anderson*, 845 F.3d at 596. The Court concluded that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421–22. Thus, for speech to be subject to the employer's "control" for present purposes, it must "owe[] its existence to" the "public employee's professional responsibilities," *id.*, or otherwise be "for the benefit of the employer," *Anderson*, 845 F.3d at 596.

Bevill did not speak for QPD's benefit when he submitted an affidavit on McGee's behalf, and his speech did not owe its existence to QPD. It follows that Bevill's affidavit was not subject to QPD's control in the relevant sense, and he therefore spoke as a private citizen, not a public employee. Contrary to Defendants' argument, Quitman's policy supports this view because it underscores that Bevill's conduct conflicted with his employer's objectives. Bevill's speech could not have benefited QPD when, according to Defendants, the speech violated official policy and disparaged local officials. *Cf. Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 988 (3d Cir. 2014) (stating that "nothing about [a public employee's] position compelled" him to speak when his employer "appear[ed] to *discourage* such speech through its Code of Ethics' confidentiality provision, which [was] being used to justify [the employee's] termination") (emphasis in original). Indeed, Defendants observe that Bevill disrupted QPD's operations and possibly "tarnish[ed] the image of the City and [QPD]" "by injecting himself into a criminal trial and disparaging the only district judge, district attorney, and sheriff in Wood County." Bevill could not have acted for the benefit and subject to the control of his employer when he engaged in speech against his employer's interest.

But even assuming QPD somehow controlled Bevill's speech, that fact alone is not dispositive. First, *Anderson* notes that the ability of the employer to control the employee's speech "might" affect the determination of whether the employee spoke pursuant to his official duties, not that it must. *Id.* Furthermore, *Anderson* derives this "insight" into the contours of "official duties" from the *Restatement (Third) of Agency*, 845 F.3d at 596, which in turn states that "[i]f an employee commits a tort . . . while acting within a course of conduct subject to the employer's control, the employee's conduct is within the scope of employment *unless* the employee was engaged in an independent course of conduct not intended to further any purpose of

No. 20-40250

the employer." RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006) (emphasis added).

Through submitting the affidavit, Bevill sought on his own accord to help a friend outside of the workplace. He did not inform anyone at QPD that he intended to submit the affidavit. This kind of activity, which has "an analogue to speech by citizens who are not public employees," is protected by the First Amendment. *See Anderson*, 845 F.3d at 594, 597 (holding that a law clerk's formal complaints against a judge to a state commission were protected speech since the speech was "'the kind of activity engaged in by citizens'—including licensed lawyers—'who do not work for the government'"); *see also Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016) (holding that a police officer's statements made to the FBI were protected speech since they "were made outside the normal chain of command and without the knowledge or permission of anyone else in the police department"), *cert. denied sub nom*, *Town of Ball v. Howell*, 137 S. Ct. 815 (2017); *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785 (7th Cir. 2016) (finding protected speech where a police officer reported official misconduct to the FBI and where the reported misconduct extended beyond the police department and included higher-level political corruption in city government).

No. 20-40250

In sum, we conclude that Bevill has plausibly averred a deprivation of his First Amendment rights.[4]

### B. Clearly Established Right

Given our conclusion that Bevill has adequately pled a violation of his constitutional rights, we must now consider whether the First Amendment right at issue was clearly established at the time it was infringed. We hold that it was.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009) (quotation omitted). "Answering in the affirmative requires the court to be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (citation and internal quotation marks omitted).

Defendants argue that the law was not clearly established that "any person other than the ultimate decision-maker could be liable for First Amendment retaliatory termination," until this court issued its opinion in *Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018). According to

---

[4] As indicated by this court's decision in *Anderson*, the analysis above is enough to conclude that Bevill has adequately pled both the second and third elements of his First Amendment retaliation claim. That said, our conclusion that Bevill has shown that his interest in the affidavit outweighs the government's interest is further buttressed by the realization that Defendants raise hypothetical, not actual, effects of Bevill's speech on the ability of Quitman to provide public services. But "[r]eal, not imagined, disruption is required." *See Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (5th Cir. 1983)). Regardless, if Defendants had identified actual effects, Fifth Circuit precedent indicates that testimony about potential malfeasance in Texas's criminal justice system "outweigh[s] the government's interest in efficiency." *See Breaux v. City of Garland*, 205 F.3d 150, 157 n.10 (5th Cir. 2000).

13

Defendants, because their purported unconstitutional conduct occurred a year before this court issued the *Sims* decision, they are entitled to qualified immunity. The district court determined that *Sims* settled a question distinct from the one posed here—namely, whether a supervisor/coworker of the plaintiff can be held liable for influencing a final decisionmaker to terminate the plaintiff's employment. The district court went on to explain that another case, *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) (en banc), clearly established that Defendants were not unfettered by the First Amendment, long before Defendants allegedly retaliated against Bevill.

In *Sims*, the plaintiff, a police officer, reported his supervisor's illegal conduct to the Texas Rangers. 894 F.3d at 636. Shortly thereafter, the supervisor met with the police chief, who in turn placed the plaintiff on probation for an unrelated reason before ultimately terminating him. *Id.* at 636–37. The plaintiff claimed that his supervisor was liable for improperly influencing the police chief's decision to fire him. *Id.* at 637. Noting there was confusion in the caselaw on "whether someone who is not a final decisionmaker and makes a recommendation that leads to the plaintiff being harmed can be liable for retaliation," this court clarified that a supervisor/coworker of the plaintiff could still be liable for First Amendment retaliation claims even though the supervisor/coworker did not have the power to terminate the plaintiff's employment. *Id.* at 638–39. Specifically, this court summarized its holding as follows: "If an individual defendant's animus against a coworker's exercise of First Amendment rights is a link in the causal chain that leads to a plaintiff's firing, the individual may be liable even if she is not the final decisionmaker." *Id.* at 639 (citations omitted).

In *Kinney*, a pair of instructors at the East Texas Police Academy, a division of Kilgore College, testified against an officer who fatally shot a teenager. 367 F.3d at 341–42. Heads of police departments in East Texas, who provided most of the officers to the academy for training, then refused

to send their officers to the academy as long as the instructors continued teaching there. *Id.* at 342–43. In response, one of the instructors resigned, while the other instructor was let go. *Id.* at 345. Both instructors sued the department heads for First Amendment retaliation. *Id.* at 345–46. The department heads argued that they could not be held responsible for the instructors' employment outcomes because only the college organizing the academy could terminate its employees. *Id.* at 357. This court rejected that argument, holding "that it would [not] have been reasonable for officers in [the defendants'] positions to believe that they were unfettered by the First Amendment merely because their economic relationship with [the plaintiffs] was non-employment and non-contractual." *Id.* at 368.

We agree with the district court that *Sims* settled the question whether a supervisor/coworker of the plaintiff can be held liable for First Amendment retaliation under § 1983 for influencing a final decisionmaker to terminate the plaintiff's employment. That question is distinct from the one posed here—whether a governmental official, not a supervisor/coworker of the plaintiff, can be held liable for First Amendment retaliation under § 1983 for influencing the plaintiff's employer to terminate the plaintiff's employment.

*Sims*' discussion of the uncertainty in the caselaw regarding non-final decisionmakers supports the district court's reading of the case. According to the *Sims* court, "the seeds of confusion" as to liability for non-final decisionmakers were "unwittingly planted" when the Fifth Circuit rendered its decision in *Beattie v. Madison County School District*, 254 F.3d 595 (5th Cir. 2001). 894 F.3d at 640. "[T]he focus of the appeal [in *Beattie*] was on the question of municipal liability, which attaches only if final decisionmakers are liable." *Id.* (citing *Beattie*, 254 F.3d at 602). Later cases misread *Beattie* for the proposition that only final decisionmakers may be liable for First Amendment retaliation. *See id.* at 640–41. But, like *Beattie*, they did so in the context of potential liability for a non-final decisionmaker who persuaded a

No. 20-40250

higher authority to fire the plaintiff. *See, e.g.*, *Culbertson v. Lykos*, 790 F.3d 608, 627 (5th Cir. 2015) (discussing liability for an assistant district attorney who influenced a county commissioners court's decision to sever relations with the plaintiffs' employer, which resulted in the plaintiffs' termination);[5] *Howell*, 827 F.3d at 526 (discussing liability for a police chief who influenced a board of alderman to terminate the plaintiff);[6] *Pennypacker v. City of Pearl*, 689 F. App'x 332, 332 (per curiam) (5th Cir. 2017) (discussing liability for an employee of a golf course who influenced a board of alderman to fire the plaintiff).

*Sims* "provid[ed] the overdue clarification" in this area by explaining that a case decided prior to *Beattie* and its progeny, *Jett v. Dallas Independent School District*, 798 F.2d 748, 758 (5th Cir. 1986), controlled. *Sims*, 894 F.3d at 641. *Jett* required that a school athletic director needed only to "establish an affirmative causal link between" a principal's recommendation to the

---

[5] In Texas, where the events of *Culbertson* took place, the county commissioners court determines the budget for the district attorney's office, which includes approval of contracts for certain services. *See Culbertson*, 790 F.3d at 615–16. Thus, that court is a higher authority vis-à-vis the assistant district attorney.

[6] *Howell* may differ from this case on the question whether the defendants violated a clearly established right, but it remains no less persuasive as to whether Bevill suffered a deprivation of that right in the first instance.

district, i.e., higher authority, that it reassign the director to another position and the district's decision to do so. *See* 798 F.2d at 758.[7]

Returning to the case at bar, the district court concluded that *Sims* was inapplicable because it dealt with "retaliatory employment termination in the context of an employment relationship," i.e., all parties were employed by the same governmental agency. The district court determined that *Kinney* instead controlled because it "contemplated the situation in which a government [official], because of retaliatory animus, uses his or her position to influence a *third-party* employer to terminate one of its employees for exercising his or her First Amendment rights." Applying *Kinney*, the district court concluded that Defendants "had 'fair warning' that allegedly using their respective government positions to violate Plaintiff's First Amendment rights would be objectively unreasonable in light of clearly established law at the time." We agree with the district court that *Kinney* controls. The factual distinctions between *Kinney*, *Sims*, and the present action are perhaps most easily recognized with reference to a series of simple diagrams:

---

[7] *Sims* also opines that cases following *Beattie* have mistakenly "imposed a causation standard that is more stringent than *Jett*'s 'but-for' standard for nonfinal decisionmakers." 894 F.3d at 640 (citing, as examples, *DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009), and *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 351 (5th Cir. 2006)). Underlying this error is the incorrect conclusion that the "cat's paw" theory of liability, which holds that an employee's unlawful conduct may be imputed to his or her employer, may also be used to ascribe liability the other way around. *See id.* at 640–41. Given the flow of liability from an employee to an employer under the cat's paw theory, misapplications of the theory could only have occurred within decisions that addressed a subordinate who affected a higher authority's decision-making. This demonstrates that *Sims* clearly established a different right than the one at issue here, specifically the right of a plaintiff to be free from a non-final decisionmaker retaliating against him or her by influencing a higher authority to take adverse action against the plaintiff.

No. 20-40250

*Bevill v. Fletcher*



*Kinney v. Weaver*



*Sims v. City of Madisonville*



Fletcher asserts that the district court erred in concluding that *Kinney*, rather than *Sims*, controlled since this court's opinion in *Kinney* does not draw a distinction between liability for those who convince a higher authority to terminate a plaintiff and those who do not. But that does not mean the district court erred in holding that *Kinney* applied to situations like Bevill's while *Sims* was inapplicable. Notably, *Sims* nor the cases discussed therein (with one exception) address *Kinney*. The one outlier, *Culbertson*, discusses *Kinney* but not in the context of qualified immunity. 790 F.3d at 617–19, 621, 623. Once again, this shows that *Sims* clearly established a different right than the one litigated here.

Fletcher further contends that *Kinney* merely establishes that employees enjoy at least "some First Amendment protections against government retaliation for their testimony." But Fletcher's argument is belied by his own assertion that the Supreme Court, even prior to *Kinney*, has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Hence, a fairer reading of *Kinney* is that it clearly establishes the right of a plaintiff to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights.

For their part, Castloo and Wheeler argue that *Kinney* is distinguishable because the police department heads in that case were actually final decisionmakers, not non-final decisionmakers that convinced another party to take adverse action against the plaintiff. But the police department heads argued that they could not be held liable *because* "their conduct did not deny [the instructors] the benefit of employment [since the] [c]ollege, and not the [department heads], held the authority to refuse to renew [the instructors'] contracts." *Kinney*, 367 F.3d at 357. The police department heads claimed that they "possess[ed] final authority over"

whether their officers would train at the police academy, not whether they could fire the plaintiffs. *Id.* at 341. Accordingly, Castloo and Wheeler have misread *Kinney*.

Changing tack, Castloo and Wheeler also assert that both *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378 (5th Cir. 2006), and *Juarez v. Aguilar*, 666 F.3d 325 (5th Cir. 2011), indicate *Kinney* was one case in the long line of decisions that left the right at issue here unresolved until *Sims*. While both cases consider *Kinney*, *Oscar Renda* does not do so within the context of qualified immunity, 463 F.3d at 382–83, and *Juarez* does not do so in determining whether the right at issue was clearly established, 666 F.3d at 335–36. Consequently, Castloo and Wheeler's reliance on *Oscar Renda* and *Juarez* is also misplaced.

Castloo and Wheeler additionally cite to *Clarkston v. White*, 943 F.3d 988 (5th Cir. 2019), in support of their argument that *Sims* first clearly established the right at issue here. Although *Clarkston* discusses *Sims*, 943 F.3d at 993 n.5, it also addresses a situation in which the plaintiff was allegedly retaliated against by an individual that influenced a higher authority's decision to harm the plaintiff. *Id.* at 991–92. Hence, *Clarkston* actually provides support for the conclusion that *Sims* addressed a right different than the one at issue here.

In sum, the district court correctly determined that Bevill's First Amendment right was clearly established at the time it was violated.

### C. Conspiracy

Because Bevill has shown that Defendants are not entitled to qualified immunity, we must determine whether he has stated a claim for conspiracy under § 1983. We conclude that he has done so.

No. 20-40250

Fletcher argues that Bevill has not sufficiently alleged that Fletcher was personally involved in or caused any violation of Bevill's First Amendment rights. However, "[a] conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act . . . ." *Latiolais v. Cravins*, 484 F. App'x 983, 989 (5th Cir. 2012) (per curiam) (quoting *Hale*, 45 F.3d at 920). Hence, "[r]egardless of whether or not [Fletcher's] actions alone actually caused a constitutional violation, liability can still be imposed on [Fletcher's] alleged membership in [a] conspiracy." *See id*. at 991. The question, then, is whether Bevill adequately averred that Defendants had an agreement to violate his constitutional rights under the color of state law.

Defendants assert that Bevill has pled conclusory allegations in support of his claim that they had such an agreement. Bevill, on the other hand, contends that Fletcher's statements made in the April 2017 *Kilgore News Herald* article and Bevill's own "familiar[ity] with the local players and political climate, including the relationships between and among the sheriff, district attorney and judge" together imply that Defendants "were close and often worked in concert." These allegations, joined with Bevill's description of Defendants' joint meeting with Mayor Dobbs imploring him to cause Bevill to be terminated, "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Fletcher's reliance on *Montgomery v. Walton*, 759 F. App'x 312 (5th Cir. 2019) (per curiam), and *Jabary v. City of Allen*, 547 F. App'x 600 (5th Cir. 2013), in support of his argument fails to warrant a different conclusion since both cases are readily distinguishable. In *Montgomery*, the plaintiff failed to adequately allege a "common motive" for why the purported co-conspirators targeted him. 759 F. App'x at 315. Bevill, on the other hand, pled

facts plausibly indicating that Defendants retaliated against him to protect their reputations. Furthermore, the connection among the alleged co-conspirators in *Montgomery* was "unclear from the face of the" operative complaint. *Id.* But, as discussed above, Bevill sufficiently averred that Defendants worked closely with one another.

As to *Jabary*, the plaintiff there merely pled that the alleged co-conspirators attended "private meetings" and had "secret conversations" during which the co-conspirators discussed depriving the plaintiff of his constitutional rights. 547 F. App'x at 611. In contrast, Bevill has averred the contents of Defendants' discussion with Dobbs, which entailed threats to withhold resources from Quitman and support for QPD. As *Jabary* observes, a plaintiff's § 1983 conspiracy claim need not satisfy "a 'probability requirement at the pleading stage; [plausibility] simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Id.* at 610 (alterations in original) (quoting *Twombly*, 550 U.S. at 556). That minimum standard has been met here.

## IV. CONCLUSION

For the foregoing reasons, the order of the district court denying Defendants' motions to dismiss is AFFIRMED.

No. 20-40250

ANDREW S. OLDHAM, *Circuit Judge*, dissenting:

All agree that Terry Bevill must overcome qualified immunity to sue these defendants for First Amendment retaliation. *Ante*, at 6–7. And all agree that Bevill cannot overcome qualified immunity unless "the court [can] point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* at 13 (quoting *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013)).

The majority finds the requisite authority in *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc). Yet it takes the majority seven pages of writing—plus one page of elegant geometric diagramming—to explain how *Kinney* clearly established the right the defendants allegedly violated. *Ante*, at 13–20. And never mind that *Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018), which we decided shortly after the events giving rise to this case, described the law in this area as "confus[ed]" and "unsettled" before trying to "provide the overdue clarification." *Id.* at 638, 640–41.

Whatever one might think about qualified immunity, I think we're duty bound to say the law is not clearly established when it takes a full-page flow chart to hold otherwise. I respectfully dissent.