# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-70032

CHARLES DON FLORES,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before KING, JOLLY, and HAYNES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Charles Don Flores was convicted of capital murder and sentenced to
death in Texas in 1999, based on his culpability for the shooting death of
Elizabeth Black while in the course of committing robbery and burglary of her
home on January 29, 1998. He requests a certificate of appealability (COA)
authorizing him to appeal the district court's denial of his request to amend
his federal habeas petition to pursue previously defaulted claims of ineffective
assistance of trial counsel. For the reasons that follow, we DENY a COA.

United States Court of Appeals
Fifth Circuit

**FILED**

July 21, 2015

Lyle W. Cayce
Clerk

No. 14-70032

I.

We begin with the facts relevant to our consideration of the claims Flores seeks to assert by way of amendment. During individual voir dire at Flores's capital murder trial, the prosecution peremptorily struck venire members Gloria Cantu and Brian Cunningham. Flores did not object to either strike. The following day, the prosecution peremptorily struck venire member Damon Castillo after the trial court denied a challenge for cause. Defense counsel raised a *Batson*[1] objection to the strike of Castillo and also to the strike of Cantu on the previous day. The trial court took judicial notice that Flores, Cantu, and Castillo are Hispanic. Defense counsel suggested that there was no apparent reason for the strikes except that the State did not want any Hispanics on the jury. The trial court pointed out that a Hispanic female had already been selected to serve on the jury. Defense counsel asked the court to consider that the defense had made a prima facie case of racial discrimination by the State. The following exchange then took place:

> THE COURT: Well, I don't believe that the attorney that made the challenge to Gloria Cantu is in the Courtroom today. And I would have to refresh my recollection of what did go on at that time; however, I can say that the Court did not observe anything yesterday that would appear to be racially motivated.
>
> What is the State's response to striking Damon Castillo?
>
> [PROSECUTOR] WEST: Judge, am I to assume that you do believe there's a prima facie case [as] to Castillo?
>
> THE COURT: Well, I'm going to assume there is, and I want to hear your side of it.

After hearing the prosecutor's explanation for the strike of Castillo, the trial court found that the strike was not based on any racial reasons, but rather

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

No. 14-70032

on reasons having to do with his probability of convicting the defendant and assessing the death penalty. With respect to Cantu, the court stated:

> I think we need to have [Prosecutor] Davis down here to refresh his memory from his notes and refresh the Court's memory also. Off the top of my head, I can't recall anything that appeared to me to be racially motivated in the examination of Ms. Cantu or the State's strike.

The Court then stated that it would appreciate it if *Batson* challenges were made at the time of the strike. The prosecution objected that the challenge of the strike of Cantu on the previous day was untimely, to which the Court responded: "Well, I'll hear evidence on it nonetheless." There is nothing further in the state court record regarding the *Batson* challenge.

Following jury selection, the State presented the following evidence at the guilt-innocence phase of the trial. On the morning of January 29, 1998, Elizabeth Black and her dog were shot to death in their home in Farmers Branch, Texas. Law enforcement officials found fragments of potato on the floor, furniture, walls, and ceiling in the vicinity of Mrs. Black's body. They also found a .380 caliber bullet on the floor near her body. Based on the size of the dog's wound, the officers believed the dog had been shot with a large-bore weapon, such as a .44 caliber.

The officers discovered a large hole in the wall above the toilet in the hall bathroom. In the master bathroom, they discovered that the medicine cabinet and sink had been torn from the wall. They found a large potato in the sink. They discovered $39,000 in cash hidden inside the master bedroom closet. Mr. Black stated that their son, Gary, who was in prison for selling drugs, had left the money with his parents. Gary's common-law wife, Jackie Roberts, had been receiving $500 of this money from the Blacks each month. Jackie Roberts, who was on probation for possessing methamphetamine, lived with her mother and three children (two fathered by Gary Black) on Emeline Street, near the

3

Blacks' home. She had become romantically involved with Richard Childs about three weeks before the murder.

Based on interviews with the Blacks' neighbors, law enforcement officers learned that a purple, pink, and yellow Volkswagen had been parked in the Blacks' driveway on the morning of the murder. Jackie Roberts's ex-husband, Doug Roberts, upon learning that the multi-colored Volkswagen had been seen at the Blacks' home on the morning of the murder, reported Childs's possible involvement to the police, based on his knowledge of Childs's ownership of a vehicle fitting that description.

Neighbors of the Blacks told the police that on the morning of the murder, the Blacks' garage door was open a few feet, which was unusual. Other neighbors reported that the driver of the Volkswagen got out of the vehicle, rolled underneath the garage door, and raised the door for the Volkswagen's passenger. Another neighbor, Jill Bargainer, told police that she saw two men get out of the Volkswagen. The next day, she viewed a photo line-up and identified Richard Childs as the driver. She described the passenger as a man with dark hair and eyes, of medium build, dressed in dark-colored clothing. At her request, Bargainer was hypnotized by the police prior to working on a composite drawing of the passenger.

At trial, Bargainer informed the prosecutor that, after having seen Flores in the courtroom, she was prepared to identify him as the passenger. The next day, the trial court conducted a hearing outside the presence of the jury to determine whether Bargainer's identification testimony was admissible. At the conclusion of the hearing, the trial court found that there was clear and convincing evidence that the hypnosis undergone by Bargainer did not render her in-court identification of Flores untrustworthy. The court therefore denied Flores's motion to exclude her testimony. Before the jury, Bargainer identified Flores as the passenger she saw get out of the Volkswagen

at the Blacks' home on the morning of the murder. In the charge to the jury at the close of the guilt-innocence phase, the trial court instructed the jury to disregard Bargainer's testimony if it had a reasonable doubt that her identification of Flores was untrustworthy.

According to various witnesses for the State, Childs, Flores, and several others spent the early morning hours of January 29 in Flores's trailer, using methamphetamine and marijuana. Childs and Flores left Flores's trailer together in Childs's Volkswagen at around 3:00 a.m. and went to Jackie Roberts's home. Roberts had arranged for an acquaintance, Terry Plunk, to sell a quarter-pound of methamphetamine to Childs and Flores. Roberts, Flores, and Childs met Plunk in an apartment. Flores weighed the methamphetamine supplied by Plunk and claimed there was a shortage. Plunk made up the alleged shortage. Roberts, Childs, and Flores then went to Flores's home. Flores weighed the drugs again, and continued to insist that Plunk had shortchanged him.

To make up the alleged shortage, Roberts agreed to pay Flores $3,900 from the cash that Gary Black had hidden at his parents' home. Childs and Flores took Roberts to her home. Childs's former girlfriend, Vanessa Stovall, testified that Childs and Flores arrived at Childs's grandmother's home early in the morning, used some methamphetamine, and then left in the Volkswagen.

Childs was arrested soon after being identified as the driver of the Volkswagen. When he was arrested, he possessed amphetamine and a box containing the same brand of .380 ammunition that had been found at the murder scene. In a search of his grandmother's home, police found a .44 Magnum revolver and shells, two boxes of .357 bullets, and a pair of gloves. Granular material found inside the .44 Magnum barrel was identified as starch grains consistent with those from a potato.

No. 14-70032

The day after the murder, Flores admitted to a friend that he had shot the dog, but said that Childs had shot the "old lady." Flores made a similar statement to his father-in-law.

Two days after the murder, Flores and two others towed Childs's Volkswagen to Flores's father's business, where Flores painted the Volkswagen with black spray paint. The group then towed the Volkswagen to a freeway entrance ramp, where Flores poured gasoline into it and set it on fire. When a passing motorist stopped to offer assistance, Flores drove away in the tow car. The motorist followed, and a high-speed chase ensued during which Flores fired shots at the motorist.

On April 18, 1998, two Kyle, Texas police officers stopped a Volvo traveling north on the interstate. An angry motorist stopped at the scene to complain that the driver of the Volvo had almost run him off the road earlier. Flores, the driver of the Volvo, identified himself to police as Juan Jojola (Flores's brother) and presented a social security card bearing that name. After Flores failed field sobriety tests, he was placed under arrest for driving while intoxicated. As one of the officers started to cuff his hands behind his back, Flores turned and struck the officer's head with his elbow. A struggle ensued, during which Flores tried to push both of the police officers onto the freeway in front of oncoming traffic. Eventually, a deputy sheriff arrived and assisted the police officers in handcuffing Flores. Because of his use of an alias, the Kyle officers did not discover that Flores had an outstanding federal warrant for his arrest, and he was released from jail on bond.

On May 1, 1998, law enforcement officers arrested Flores after a high-speed chase through a residential neighborhood. The chase ended when Flores collided head-on with another vehicle. After a foot chase, an FBI agent caught Flores trying to go over a fence in the back yard of a residence. He struggled with the agent to prevent being handcuffed, but was eventually subdued with

6

No. 14-70032

assistance from the owner of the residence. Flores was carrying a knife and pager and had an identification card for Juan Jojola with Flores's photograph on it.

Flores suffered a broken kneecap in the head-on collision. On July 10, 1998, Officer Sherman took Flores to Parkland Hospital for treatment. As Officer Sherman pushed Flores's wheelchair through an infirmary door, Flores reached around with both hands and grabbed the grip of Officer Sherman's gun. A struggle ensued, during which Flores bit Sherman and threatened to kill him. Finally, a doctor got the gun, but Flores continued to struggle with Officer Sherman. When Officer Sherman attempted to spray Flores with Mace, Flores grabbed the can and began spraying it into Officer Sherman's eyes and on hospital staff.

After hearing all of this evidence, the jury convicted Flores of capital murder.

At the punishment phase, the State presented evidence of Flores's prior convictions for misdemeanor theft, criminal mischief, possession of marijuana, robbery by threats, and possession of cocaine. The State also presented Flores's prison disciplinary records evidencing his convictions for fighting without a weapon, and failing to obey orders. Another witness testified that in 1997, Flores forced his way into the witness's apartment, fired shots, and kicked his pregnant girlfriend in the stomach. A law enforcement officer who escorted Flores to and from court during his capital murder trial testified about a February 10, 1999 incident, in which Flores became belligerent and attempted to attack the officer. According to the officer, it took six men to subdue Flores.

After the State rested at the punishment phase, defense counsel informed the court that the defense had intended to call as witnesses Flores's father, mother, and wife, but had been informed by all three that if called as

witnesses, they would invoke their Fifth Amendment privileges against self-incrimination.  (Flores's parents were under indictment for hindering his apprehension, and his wife was the subject of a pending grand jury investigation.)  Defense counsel presented a stipulation that there were no medical records to substantiate testimony that the pregnant woman Flores kicked in the stomach had suffered a miscarriage.

Based on the jury's answers to the special punishment issues, the trial court sentenced Flores to death.  His conviction and sentence were affirmed on direct appeal.  *Flores v. State*, No. 73,463 (Tex. Crim. App. Nov. 7, 2001).

On direct appeal, Flores claimed that the trial court erred by admitting Bargainer's identification testimony because the State failed to prove that the hypnosis had not tainted her testimony.  The Texas Court of Criminal Appeals (TCCA) denied relief, holding that the trial court's procedures complied with state law, and that the jury was free to attach whatever weight it deemed appropriate to Bargainer's testimony.

On September 13, 2000, while his direct appeal was pending, Flores filed an application for state habeas relief, raising twelve grounds for relief, including the claim that the trial court erred by admitting Bargainer's identification testimony.  On December 14, 2000, Flores filed a pro se amendment to his state habeas application, raising nineteen additional grounds for relief.  The trial court recommended that relief be denied on all thirty-one grounds.  With respect to the claim regarding the admission of Bargainer's identification testimony, the state habeas court concluded that the claim was barred from consideration because it had been raised and rejected on direct appeal.  In the alternative, the state habeas court held that Flores had failed to show that Bargainer's identification of him was the result of hypnosis or unconstitutionally tainted, and that, even if improperly admitted, any harm was prevented by a curative instruction.  The TCCA adopted the

No. 14-70032

trial court's findings and denied Flores's state habeas application. *Ex parte Flores*, No. WR-64,654-01, 2006 WL 2706773 (Tex. Crim. App. Sept. 20, 2006). The Supreme Court of the United States denied certiorari. *Flores v. Texas*, 552 U.S. 884 (2007).

By agreement of the parties and the magistrate judge, Flores timely filed a skeletal federal habeas petition on September 18, 2007, raising 45 potential claims, with the promise to file a final amended petition, raising no new claims, by March 24, 2008. In accordance with that agreement, he filed an amended petition on March 24, 2008, raising only four claims:

(1) the jury instructions on mitigation were constitutionally defective;

(2) the prosecutor failed to disclose known impeachment evidence regarding an expert witness for the State;

(3) the trial court improperly admitted hypnotically-enhanced eyewitness testimony in violation of his Fourteenth Amendment right to due process and his Sixth Amendment right to confrontation; and

(4) state habeas counsel rendered ineffective assistance by failing to raise claims that

(a) Flores's due process rights were violated when the trial court failed to complete a *Batson* hearing initiated by trial counsel;

(b) Flores received ineffective assistance when trial counsel failed to secure a ruling on his *Batson* challenge after initiating a hearing;

(c) Flores received ineffective assistance when his appellate counsel failed to raise a due process challenge to the trial court's failure to complete the *Batson* hearing; and

(d) Flores received ineffective assistance when appellate counsel did not raise a claim alleging ineffective assistance for trial counsel's failure to secure a ruling on the *Batson* challenge.

No. 14-70032

On March 3, 2011, the magistrate judge recommended that relief be denied. Flores objected to the recommendation. On August 10, 2011, Flores filed a motion to withhold a decision pending the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) (holding that ineffective assistance of state habeas counsel can constitute cause to excuse the procedural default of an ineffective-assistance-of-trial-counsel claim). After *Martinez* was decided, the parties were instructed to file supplemental briefs addressing *Martinez*. Both parties filed the supplemental briefs on June 1, 2012. In his supplemental brief, Flores requested leave to amend his federal habeas petition to assert claims that his trial counsel rendered ineffective assistance by:

(1) failing to secure a ruling on his *Batson* claim;

(2) failing to properly challenge the hypnotically-enhanced testimony; and

(3) failing to investigate and present mitigating evidence at the punishment phase of his trial.

With his supplemental briefing, Flores presented an affidavit of Dr. R. Edward Geiselman, executed on August 3, 2007, in which he expressed the opinion that Bargainer's in-court identification of Flores was not trustworthy. Flores also presented a declaration of mitigation specialist Lynda Tussay, executed on September 4, 2007. Tussay interviewed Flores and some of his family members. She recommended a neuropsychological examination to determine whether Flores had brain damage as a result of his history of drug abuse, sniffing gasoline, and head injuries as a child. She stated that Flores reported that when he was in elementary school, he was sexually abused by a 13-year-old cousin, who later died of AIDS, but that this abuse was never disclosed to anyone prior to her interview of Flores. Tussay also speculated that it was likely that Flores has a family history of mental illness that made

him susceptible to mental illness and that it was likely that he was a victim of child abuse.  In the supplemental briefing, counsel noted that Tussay had estimated that 160 hours of additional investigation were needed and that without the documents and interviews Tussay said that she needed, her hypotheses could not be confirmed.

Flores argued that amendment of his habeas petition should be allowed because these ineffective assistance of trial counsel (IATC) claims did not become "ripe" until after *Martinez* was decided.  He asserted that the ineffective assistance of his state habeas counsel excused the default of the claims.

After the supplemental briefs were filed, the district court entered an order suspending a final ruling until the Supreme Court issued its decision in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) (holding that *Martinez* applies to Texas cases).  Following the decision in *Trevino*, the magistrate judge ordered the parties to file supplemental briefs addressing *Trevino*.

On July 7, 2014, the district court entered an order accepting the magistrate judge's March 2011 recommendation, as modified.  The district court denied Flores's request for leave to amend his federal habeas petition. The district court rejected Flores's argument that the IATC claims only became ripe after *Martinez* and *Trevino*, because he could have presented any potentially meritorious IATC claims in his original petition, even if the claims would have been subject to a procedural bar at that time.

With respect to the *Batson* IATC claim, the district court concluded that Flores failed to demonstrate any reasonable expectation that further development would authorize habeas relief.  Assuming that the claim related back to the timely-filed claims for purposes of the one-year statute of limitations, the district court held that the claim was insubstantial and did not come within the equitable exception created in *Martinez*.

No. 14-70032

Regarding the IATC claim for failure to investigate mitigating evidence, the district court held that Flores failed to explain why he did not include the claim in his original or amended federal habeas petitions, and failed to demonstrate that the claim had any merit or that it would come within the *Martinez* exception. The court also held that the claim would be time-barred because it did not relate back to the allegations in either the original or amended habeas petitions.

Finally, the district court concluded that the new IATC claim based on counsel's failure to contest Bargainer's testimony was insubstantial and also time-barred.

The district court denied a COA and denied Flores's motion to alter or amend the judgment.

II.

Flores requests a COA from this Court to appeal the district court's denial of leave to amend his federal habeas petition to raise the three IATC claims described above. When a district court denies habeas relief on a procedural ground

> without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies relief on the petitioner's constitutional claim on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *see also Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003) (stating that a prisoner seeking a COA makes "a substantial showing of the denial of a constitutional right . . . by demonstrating that jurists of reason could disagree with the district court's

No. 14-70032

resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further" (citations and internal quotation marks omitted)).

A.

With respect to the *Batson* IATC claim, the district court stated that the record does not indicate why the *Batson* hearing was not resumed, what would have happened if it had been, or what may have transpired off the record to resolve the issue. The court noted that Flores's federal habeas counsel had not described his efforts to obtain the information and had not demonstrated any reasonable expectation that such information would authorize federal habeas relief. The court stated that there was no indication that the trial court would have altered its opinion about whether there was any racial motivation in exercising the peremptory strike or that the defense attorney's action in not resuming that part of the hearing was anything other than a reasonable decision not to waste any more time on a futile effort. Accordingly, the district court concluded that it would be pointless to grant leave to amend to allege an IATC claim based on failure to obtain a ruling on the *Batson* challenge to the strike of Cantu.

With respect to Flores's request to amend his petition to assert that trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence, the district court noted that Flores listed areas of potentially mitigating evidence that were known to him as early as September 4, 2007, but did not adequately explain why he did not present the claim in his original petition filed on September 18, 2007, or his amended petition filed on March 24, 2008. The court also pointed out that Flores did not identify which, if any, of these areas of potentially mitigating evidence were not already known to and reasonably considered by trial counsel in apportioning the limited investigative resources available to them before trial. Accordingly, the court

13

concluded that the claim was insubstantial and would not come within the exception to the procedural bar created in *Martinez.*

The court denied leave to amend to assert a claim that trial counsel failed adequately to contest the testimony of Jill Bargainer as hypnotically induced, on the grounds that the claim was procedurally barred and time barred.  In addition, the court stated that Flores had not shown a reasonable probability that an objection to Bargainer's testimony would have prevailed, even if it had included the new evidence (Dr. Geiselman's affidavit) presented in Flores's supplemental briefing.  Because trial counsel could not be ineffective for failing to take a futile action, the court held that this proposed IATC claim was insubstantial and would not come within the exception to the procedural bar created in *Martinez.*

In his Rule 59 motion to alter or amend the judgment, Flores challenged the district court's denial of his requests to amend his habeas petition to assert the claims that trial counsel was ineffective in (1) failing to secure a ruling on his *Batson* challenge and (2) failing to challenge improperly admitted hypnosis testimony.  In its order denying the motion, the district court stated that it had denied Flores's request for leave to amend his federal habeas petition because Flores's request was not made in a timely manner, was not properly presented in a motion that gave proper notice to the State and an opportunity to reply, and sought to raise new claims that lacked potential merit.  In addition, the hypnosis IATC claim was time-barred because it did not relate back to the claims asserted in either the original or amended federal habeas petitions.

## B.

Flores argues that reasonable jurists could conclude that he was denied a constitutional right when the district court denied his request for leave to amend his federal habeas petition to pursue his IATC claims.  He contends that he demonstrated that his state habeas counsel was constitutionally

No. 14-70032

ineffective and that the claims state habeas counsel defaulted are substantial. He asserts that prior to the Supreme Court's decisions in *Martinez* and *Trevino*, he had no legal basis for asserting the IATC claims he sought to assert by amendment. He maintains that the underlying facts supporting the claims were set forth in his federal habeas petition and, because the claims arise from the same core facts as those claims that were timely filed, the claims relate back and are not time-barred.

The State counters that *Martinez* and *Trevino* do not excuse Flores's failure to timely raise his IATC claims and that, even if the claims could relate back to the original petition, the district court acted within its discretion in denying leave to amend because the claims are insubstantial. The State points out that the legal and factual bases of the IATC claims were known to Flores at the time he filed his initial and amended federal habeas petitions and that federal habeas counsel could have presented the claims at that time, even if such claims would have been subject to a procedural bar. The State notes that Flores presented other unexhausted, and thus procedurally-barred, claims in his habeas petition. Thus, the fact that the State would have asserted a procedural bar had these IATC claims been presented in the timely-filed federal habeas petition does not excuse Flores's failure to raise them.

C.

Federal habeas petitions "may be amended . . . as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Federal Rule of Civil Procedure 15 gives discretion to the district court to grant leave to amend and states that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). We generally review a district court's denial of leave to amend for abuse of discretion. *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014). However, when the denial of leave to amend is based on futility, our standard of review is de novo. *See*

*Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) ("Where the district court's denial of leave to amend was based solely on futility, we apply a de novo standard of review identical, in practice, to the standard used for reviewing a dismissal under Rule 12(b)(6)." (internal quotation marks omitted)). In determining whether to grant leave to amend, the district court may consider whether the petitioner unduly delayed raising the claim, whether the request for leave to amend resulted from bad faith or a dilatory motive, whether the petitioner had been given previous opportunities to cure deficiencies which he had failed to exercise, whether the respondent would suffer undue prejudice, and whether an amendment would be futile. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005).

All of the claims that Flores sought to raise by amendment are procedurally barred. Accordingly, amendment would be futile unless Flores could establish cause to excuse the procedural default of the claims. To succeed in establishing cause to excuse a procedural default of ineffective assistance of trial counsel claims, Flores was required to show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921. The district court denied leave to amend on the ground that amendment would be futile because all of the claims Flores sought to raise were time-barred and, furthermore, were not "substantial" within the meaning of *Martinez* and *Trevino*.

### D.

We conclude that reasonable jurists would not debate the district court's decision to deny leave to amend on the ground that amendment would be futile because the claims are not "substantial" within the meaning of *Martinez*, and

thus cannot excuse the procedural default of the claims. *See Martinez*, 132 S. Ct. at 1318 (to show that his underlying claims of ineffective assistance of trial counsel are "substantial," the petitioner "must demonstrate that the claim[s] ha[ve] some merit"). We therefore find it unnecessary to address the district court's alternative conclusion that amendment would be futile because the claims are time-barred.

With respect to the claim that trial counsel was ineffective in failing to obtain a ruling on the *Batson* challenge to the strike of Cantu, the district court noted that the record does not support Flores's presumption that he made a prima facie case of discrimination. Flores did not object when Cantu was struck, but waited until the next day to object, after two more venire members had been questioned and another Hispanic venire member struck. His only argument in support of the claim of racial discrimination was the fact that he is Hispanic and two Hispanic venire members had been struck. However, as the trial court pointed out, a Hispanic juror had already been selected. The trial court stated on the record, twice, that it had not observed any racial motivation in the State's strike of Cantu. Although the trial court assumed the defense had made a prima facie case with regard to Castillo, it made no such assumption with respect to Cantu. And, after hearing the prosecutor's explanation for the strike of Castillo, it found that the strike was not racially motivated. Because the trial court had rejected the *Batson* challenge to the strike of Castillo, and had already stated twice on the record that it did not recall any racially-motivated purpose for the strike of Cantu, reasonable jurists could not debate the district court's conclusion that Flores failed to present a substantial IATC claim based on trial counsel's failure to secure a ruling on the *Batson* challenge to the strike of Cantu. Therefore, the district court's denial of leave to amend on the ground that amendment would be futile,

because Flores failed to establish cause to excuse the procedural default of the claim, is not debatable.

Reasonable jurists also could not debate the district court's conclusion that amendment would be futile because Flores failed to present a substantial IATC claim based on the failure to properly challenge Bargainer's identification testimony, and therefore failed to show cause to excuse the procedural default of that claim. The record reflects that trial counsel vigorously challenged the admission of Bargainer's testimony. Fearing that Bargainer might identify Flores in the courtroom, defense counsel requested and obtained a hearing at which the State had the burden of producing clear and convincing evidence that the hypnosis session did not affect Bargainer's identification of Flores. When the trial court denied their motion to suppress her testimony, defense counsel requested and received a running objection to her testimony. Further, defense counsel cross-examined Bargainer about her ability to see the passenger in the Volkswagen, in an effort to discredit her identification. Even assuming that trial counsel performed deficiently by failing to present expert testimony such as that in the affidavit of Dr. Geiselman, and assuming further that the trial court would have excluded Bargainer's in-court identification of Flores had such expert testimony been presented, there is not a reasonable probability that the outcome of the trial would have been different, because there was ample other evidence that placed Flores at the scene of the murder, including his own admissions that he was there and shot the dog.

Finally, reasonable jurists would not debate the district court's conclusion that amendment would be futile because Flores failed to present a substantial claim that trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence. The record reflects that trial counsel performed some level of mitigation investigation and made strategic

choices in their mitigation strategy.  Prior to trial, defense counsel filed a motion for expert scientific assistance.  The trial court appointed a psychiatrist, Dr. J. Douglas Crowder, and ordered that he be given access to Flores to administer psychological tests.  A handwritten note indicates that Dr. Crowder met with Flores and concluded that he was "somewhat psychopathic" but "not a full-blown psychopath."  If trial counsel had called Dr. Crowder to testify at the punishment phase, the State would have been allowed to have the same psychiatric access to Flores and the opportunity to offer its own expert on rebuttal.  The record also reflects that trial counsel intended to call as witnesses Flores's father, mother, and wife, but all of them indicated that they would invoke their Fifth Amendment privileges against self-incrimination.  At the punishment phase, trial counsel argued in mitigation that Childs, not Flores, shot Mrs. Black.  Reasonable jurists would not debate the district court's conclusion that Flores failed to plead a substantial claim that counsel's decisions with respect to mitigation were deficient and not the result of sound trial strategy under these circumstances.  *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (internal quotation marks omitted)).

Linda Tussay's affidavit, presented for the first time in Flores's supplemental briefing, consists largely of unsupported speculation and hypotheses about mitigating evidence that *might* exist.  In the light of the evidence about the facts of the murder, Flores's destruction of evidence, his extensive criminal background, and his numerous, violent attempts to avoid apprehension and escape custody, Flores has failed to present a substantial claim that there is a reasonable probability that the jury would have given him a life sentence had counsel presented mitigating evidence of the types

19

identified by Flores, assuming such evidence actually exists and would have been admissible at trial.

## III.

To sum up:  We conclude that reasonable jurists could not debate the district court's decision to deny Flores's request to amend his federal habeas petition, on the ground that amendment would be futile because the claims Flores sought to assert were not substantial and thus could not excuse the procedural default of those claims.  We therefore DENY his request for a COA.