# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 16, 2025

Lyle W. Cayce
Clerk

No. 23-10881

Mark Hamilton,

*Plaintiff—Appellant*,

*versus*

The City of Wilmer, Texas; Rona Stringfellow, *Individually*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-2103

Before Higginson, Willett, and Oldham, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Mark Hamilton, former Chief of the Fire Department of Wilmer, Texas, was dismissed from his job after he testified, pursuant to a subpoena, at a probation revocation hearing for a former employee who had hidden recording devices in fire station bathrooms. Hamilton drove a city car to the hearing, wore his uniform as he testified, and did not take leave from work.

The issue here is whether Hamilton has stated a claim that he was fired in retaliation for protected First Amendment activity. We find that he has not, so we AFFIRM the decision of the district court.

I

Because this matter was before the district court on a 12(b)(6) motion, the district court relied on the allegations of the complaint made by Hamilton. In general, Appellees do not contest Hamilton's account of the facts.

Hamilton alleges that the factual background of his termination "begins" with misconduct allegations against another Wilmer Fire Department employee, Craig Lawrence, in 2019.[1] Hamilton alleges that the charge that Lawrence put recording equipment in the bathroom of the fire station at which Lawrence worked had been "generally known" by the City since that time, and that Lawrence had been put on paid leave pending trial on a criminal charge based on those allegations. However, Hamilton alleges, because of the long delay in trial caused by the Covid-19 pandemic, the City Administrator (prior to Rona Stringfellow) put Lawrence back on duty, "based on the idea that if the city was going to pay Lawrence's salary, it should at least receive his services." Hamilton alleges that, when Stringfellow became the City Administrator, both her predecessor and Hamilton informed her of Lawrence's ongoing criminal matter.

On June 16, 2022, Hamilton alleges, the Dallas County District Attorney's Office ("the Dallas DA's office") issued him a subpoena in the matter of *State of Texas v. Craig Lawrence*, in the 363rd Judicial District Court of

---

[1] Lawrence was facing allegations that he had placed a camera in the bathroom of the fire station where he worked. Per the Appellees' briefing, he was arrested and charged with a violation of Texas Penal Code § 21.15, for Invasive Visual Recording of a Bathroom/Dressing Room. In an affidavit filed in the district court, Hamilton states that Lawrence told him that he put the hidden camera in a locker room at the fire station after his locker was burglarized. Hamilton alleges that Lawrence told him the camera was pointed towards a locked bathroom area but that "nobody used the bathroom without closing the door." Lawrence had been sentenced to two years of probation on October 29, 2021, and the hearing on June 23, 2022, was in fact a revocation hearing at which he was sentenced to 270 days in prison.

Dallas County Texas. On June 20, 2022, Hamilton alleges, Lawrence informed him that he had an upcoming court date at which he would be assigned a new counselor. But he did not inform Hamilton of the subpoena.

The next day, June 21, 2022, a representative of the Dallas DA's office attempted to serve Hamilton at Wilmer City Hall. Hamilton was not present, so the representative could not serve him. However, Hamilton alleges, Stringfellow was aware that someone had come to Wilmer City Hall seeking to serve Hamilton, and she called Hamilton to relay this information. Hamilton alleges that, when Stringfellow called him, she did so on speakerphone with the Dallas DA's office representative and another city employee. Hamilton alleges that, on the phone call, he agreed to be served by email. The next day, June 22, 2022, Hamilton was served via email. He was ordered to appear on the following day, June 23, 2022, at 9:00 A.M. Hamilton alleges that, because Lawrence had told him that the purpose of the hearing was "to assign a new counselor for Lawrence," he did not feel the need to contact Human Resources, Stringfellow, or the City Attorney before he testified.

On the day of the hearing, Hamilton alleges, he appeared to testify in uniform because the subpoena had been addressed to "Chief Mark Hamilton" and wearing a uniform was "the custom of fire chiefs in Texas." Before the hearing, Hamilton alleges, Lawrence told him that he intended to resign from the fire department, and Hamilton informed him that he preferred to receive a written resignation letter. Hamilton alleges that after he was sworn in, he testified for about five minutes of direct examination by the State and a cross-examination by Lawrence's attorney.

According to Hamilton's complaint, the State asked him to state his name, employer, and position, and asked if his position was Fire Chief. Hamilton confirmed that information. The State asked if it was true that Hamilton had hired Lawrence after he was charged with the crime at issue, and

Hamilton said that Lawrence had worked for the City since 2013. Then, Hamilton alleges, the State asked if he was aware of the 2019 allegations, and he "truthfully testified that his knowledge of the case was limited to what Lawrence had told him because the District Attorney's Office and the Dallas Police Detectives refused to talk to Hamilton based on the policy or procedure to not discuss an ongoing investigation." The State asked if Hamilton "would be surprised to find out Mr. Lawrence has visited adult sexually oriented websites on his phone," and Hamilton responded that he would be surprised. Then the State asked if Hamilton was concerned with Lawrence going into people's homes, and Hamilton answered in the negative.

Subsequently, Lawrence's attorney asked Hamilton how long he had known Lawrence, and Hamilton replied, "more than 20 years." He testified that he had met Lawrence when he worked with him at the Seagoville Fire Department. When asked if the charges "sounded like the person Hamilton had known for over 20 years," he said they did not. At the end of the hearing, Hamilton alleges, Lawrence was placed into custody and sentenced to three months of confinement. Hamilton alleges that he was "stunned" because he still thought the hearing was about reassigning a counselor to Lawrence.

Hamilton alleges that, after the hearing, Lawrence sent Hamilton a resignation email, which he accepted and forwarded to the City's Human Resources Department. Immediately, he alleges, he also told Stringfellow that Lawrence had resigned. He alleges that he intended to "more fully inform" Stringfellow on two occasions over the next day: first, at a town hall meeting the evening of the hearing, during which he found "no appropriate opportunity to speak with Stringfellow" and then at a regularly scheduled meeting the next morning that Stringfellow canceled. He alleges that he did not speak to Stringfellow until the day after the hearing at an afternoon meeting that she scheduled, at which he was given a notice that he was being placed on administrative leave. The notice stated:

4

> It has come to my attention that you allegedly withheld vital information regarding one of your staff members that puts the integrity of the Fire Department and public safety in question. It is also alleged that you represented yourself as an employee of the City of Wilmer in a legal proceeding for another employee without administrative permission or legal advice from the City Attorney.

The notice also informed him that he may be contacted during the investigation and that he was expected to "fully cooperate."

On July 19, 2022, Hamilton alleges, the Human Resources Director sent Hamilton a series of eight questions regarding the subpoena, his testimony, whether he wore a city uniform, and if he indicated he was Fire Chief during his testimony. One question asked why Hamilton did "not inform and seek guidance from the City Administrator, Human Resources, or the City Attorney when [he] became aware of Mr. Lawrence's arrest," and another asked for a summary of his testimony. Hamilton alleges that on July 22, 2022, he sent "truthful responses" to each of the questions.

On August 9, 2022, Stringfellow sent him a termination letter via email. He included the email in his complaint:

> On June 24, 2022, you were placed on Administrative Leave with pay while the City investigated the claim that you withheld vital information regarding a member of your staff and whether said actions by you painted a negative light on the integrity of the Fire Department and public safety in general, as well as besmirching the City's name and bringing our reputation into disrepute. It was also alleged that you testified at a legal proceeding regarding this employee as a representative of the City without informing myself or receiving legal advice from the City Attorney. It was further alleged you did so for personal reasons but appeared in uniform and arrived and left the courthouse in a City vehicle. Further, you did not request, nor were you given, personal time off for action. These claims have been found to be true.
>
> On our City website, the Fire Department has a list of values it, and we as a City promote. One of those is: "We value the faith and trust of the community, and continually work to deserve that confidence through our attitude, conduct, and accomplishments." As a result of your actions, it is clear you do not have the level of judgment and trust required to lead the Fire Department and to be a member of the leadership team for the City of Wilmer. Therefore, your employment with the City of Wilmer is terminated immediately.

Subsequently, Hamilton appealed his termination to the City Council, which affirmed his termination. Hamilton alleges that, at the appeal hearing, the

City Attorney stated "on the record" that he would have ordered Hamilton to disobey the subpoena had he known about it.[2]

On September 21, 2022, Hamilton sued Stringfellow and the City of Wilmer. Hamilton brought claims under 42 U.S.C. § 1983 against the City of Wilmer and Stringfellow, in her individual capacity, for violating his First Amendment rights by terminating him in retaliation for speaking as compelled by a lawful subpoena. Hamilton seeks compensatory damages and equitable relief, including reinstatement, back pay, and attorneys' fees.

Both Stringfellow and the City of Wilmer filed motions to dismiss Hamilton's complaint under Federal Rule of Civil Procedure 12(b)(6). The court granted both motions, and this appeal followed.

## II

"Dismissals for failure to state a claim are reviewed de novo." *Cody v. Allstate Fire & Cas. Ins. Co.*, 19 F.4th 712, 714 (5th Cir. 2021) (citing *Magee v. Reed*, 912 F.3d 820, 822 (5th Cir. 2019)). At this stage of the proceedings, we must "accept[] all well-pleaded facts as true and draw[] all reasonable inferences in the nonmoving party's favor." *Franklin v. Regions Bank*, 976 F.3d 443, 447 (5th Cir. 2020) (citation omitted). "A plaintiff seeking to overcome a motion to dismiss because of qualified immunity grounds or for failing to state a claim must plead facts that allow the court to draw the reasonable inference that the defendant is liable for the harm alleged." *Bevill v. Fletcher*, 26 F.4th 270, 274 (5th Cir. 2022) (*Bevill I*) (citation omitted). That is, "a plaintiff must plead factual allegations that, if true, 'raise the right to relief

---

[2] Hamilton attached a copy of a transcript of this hearing to his response to Defendants-Appellees' motion to dismiss. During the hearing, the City Attorney repeatedly asked him why he did not send the subpoena to the legal counsel for the city when he received it, but no party has identified any statements in the transcript that suggest anyone told him he should have disobeyed the subpoena.

above the speculative level,'" *Mayfield v. Currie*, 976 F.3d 482, 486 (5th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), meaning that the relief is "plausible, not merely possible," *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Stringfellow and the City of Wilmer have both asserted qualified immunity to Hamilton's claims against them. Stringfellow is entitled to qualified immunity unless Hamilton can raise a fact issue showing (1) Stringfellow violated a constitutional right, and (2) the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016). With regard to the City of Wilmer, to establish municipal liability under § 1983, a party must show that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). "We have stated time and again that without an underlying constitutional violation, an essential element of municipal liability is missing." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866-67 (5th Cir. 2012) (en banc) (alteration adopted) (internal quotation marks and citation omitted).

## III

We will first address whether Hamilton states a claim that his constitutional rights have been violated.

"To succeed in a First Amendment retaliation claim under § 1983, a public employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action."

*Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (citing *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007)).

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Courts employ a two-step inquiry to determine if speech is protected under the First Amendment. The first step "requires determining whether the employee spoke as a citizen on a matter of public concern." *Id.* at 418. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* But if the answer is yes, the court analyzes whether the "government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* The Court in *Garcetti* held that, when employees make statements "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

In its Memorandum Opinion and Order, the district court stated that it accepted the following facts as true for the purposes of the motion to dismiss:

> (i) Hamilton was the Chief of the Wilmer Fire Department; (ii) the Dallas County District Attorney's office subpoenaed "Chief Mark Hamilton" to testify in a matter wherein another Wilmer Fire Department employee, Lawrence, was a criminal defendant; (iii) the Dallas County District Attorney's Office attempted to serve Hamilton at Wilmer City Hall; (iv) Wilmer City Administrator Stringfellow communicated notice of the subpoena to Hamilton in a call with another Wilmer City employee and a Dallas County District Attorney employee on the call; and (v) Hamilton testified in Lawrence's criminal proceeding—while wearing his Fire Chief uniform, during work

hours—as to (a) Hamilton's employment as Wilmer's Fire Chief, (b) Lawrence's work with Wilmer, (c) Hamilton's knowledge of allegations involving Lawrence from 2019, and (d) Hamilton's knowledge that Lawrence had not faced disciplinary action at any place of employment. Indeed, Hamilton's pleading confirms that he "testif[ied] as the Chief of the Fire Department, and not as a civilian."

Considering these facts, the district court rejected Hamilton's argument that his speech fell outside of his official duties and that it was protected First Amendment speech under *Lane v. Franks*, 573 U.S. 228 (2014).

In *Lane*, Edward Lane, an administrator of a youth program at the Central Alabama Community College (CACC) began an investigation of a state legislator who was on the CACC payroll. *Lane*, 573 U.S. at 232. Lane testified against the legislator in front of a grand jury and at two trials (as the first ended in a mistrial), and the legislator was convicted of mail fraud and theft concerning a program receiving federal funds. *Id.* at 233. Lane was subsequently fired. *Id.*

The Eleventh Circuit affirmed the district court's grant of summary judgment to the defendant Steve Franks, the CACC president, holding that Lane spoke as an employee because his investigation of the state legislator was pursuant to his official duties, even though he testified pursuant to a subpoena. *Id.* at 235. The Eleventh Circuit also affirmed the district court's conclusion that Franks would be entitled to qualified immunity because he had violated no clearly established law. *Id.*

The Supreme Court reversed on the question of "whether the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities." *Id.* at 238. Regarding whether Lane was speaking as a "citizen" when he testified, the Court held that the Eleventh Circuit had incorrectly

applied the rule from *Garcetti*, which concerned an internal memorandum, to the sworn testimony Lane gave. *Id.* at 239. While Lane had testified based on information he had learned during work, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* at 240. As to the "public concern" prong of the *Garcetti* analysis, the Court held that "[t]he content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern." *Id.* at 241. While reversing the Eleventh Circuit's determination of the constitutional merits, the Court also held that Franks was entitled to qualified immunity because First Amendment protection for Lane's testimony was not "beyond debate" at the time of the firing. *Id.* at 246.

Importantly for our purposes here, because the Supreme Court concluded it was "undisputed" that testifying was not part of Lane's normal tasks, it expressly declined to reach the question of "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties." 573 U.S. at 238 n.4.

IV

Our court's post-*Lane* jurisprudence does not clearly answer the ultimate question in this case: does *Lane*'s use of the phrase "ordinary job duties" refer to categorical duties augured by a specific role—say, law enforcement officer—or is it merely a restatement of the *Garcetti* formulation that a government employee is not protected by the First Amendment if he makes a statement "pursuant to [his or her] official duties"? *Bevill I*, 26 F.4th at 276 (citing *Garcetti*, 547 U.S. at 421).

In 2022, our court decided *Bevill I*, which takes the latter point of view. In that case, the plaintiff, a police officer, wrote an affidavit in support of a

venue transfer for a friend, a county jail administrator who was facing criminal prosecution. *Id.* at 273. In the affidavit, he wrote that based on his experience as a police officer in the county, he did not think his friend would receive a fair trial because of the friendship between the sheriff, the district attorney, and the judge. *Id.* Bevill did not sign the affidavit in his capacity as an officer, nor did he speak with anyone in the police department about the affidavit before he signed it. *Id.* Bevill was placed on administrative leave, and eventually fired for violating city policies that prohibited police officers from "seek[ing] to obtain any continuance of any trial in court out of friendship for the Defendant or otherwise interfere with the courts of justice" and "conduct[ing] themselves in a manner which . . . discredit[s] the Peace Officer profession or their employing agency." *Id.* Later, the same judge issued a warrant for Bevill's arrest for perjury, though the charges were dropped, and placed restrictive conditions on Bevill during the pendency of his bond. *Id.* at 273-74.

Bevill brought a § 1983 action against the sheriff and DA for retaliatory termination of his employment, and sued the sheriff, DA, and judge for conspiracy to terminate his employment in retaliation for his affidavit. *Id.* at 274. The district court held that the defendants were not entitled to qualified immunity on conspiracy, and that the complaint plausibly pled that the defendants formed an agreement to violate Bevill's First Amendment rights. *Id.*

This court upheld the district court's ruling, holding that Bevill was speaking as a private citizen on a matter of public concern. *Id.* at 278. While it was true that Bevill gave "his affidavit the imprimatur of his position" by putting his job title directly after his name on the affidavit, *id.* at 277, and he "learned about potential bias in [his friend's] upcoming trial through his work as a policeman," *id.* at 276, the panel majority found neither of these facts outweighed other facts "suggest[ing] that Bevill did not write his affidavit pursuant to an official duty:" he "voluntarily submitted the affidavit;" he alleged that he was not asked to, nor did he, sign the affidavit in his

11

capacity as a police officer; and he did not speak to anyone in the police department about the affidavit before he signed it. *Id.* The panel majority also rejected the defendants' contention that "[b]ecause city policies controlled Bevill's right to submit an affidavit . . . he spoke pursuant to an official duty." *Id.* at 277. A line of authority stemming from *Garcetti* permits government employers to "exercise . . . employer control over what the employer itself has commissioned or created." *Id.* at 277-78 (citing *Garcetti*, 547 U.S. at 421-22). But Bevill's affidavit "did not owe its existence to" the police department, in part because it *specifically conflicted* with his employer's policy and was against his employer's interest. *Id.* at 278.

Six months after the *Bevill I* opinion, our court decided *Rogers v. Hall*, 46 F.4th 308, 309 (5th Cir. 2022). *Rogers* states that, if someone is a "public law enforcement officer," he "arguably" falls within the "scenario *Lane* left open for another day." *Id.* at 313.

The plaintiff in the case, John Rogers, then Chief of Investigation at Mississippi State Penitentiary (Parchman), investigated allegations by a Parchman inmate that he had been assaulted by a corrections officer on November 21, 2016. *Id.* at 310-11. Rogers alleged that, in the process of the investigation, he left two Corrections Investigation Division (CID) officers in an interview room with a prison guard who was implicated in the assault. *Id.* at 310. He returned when he heard a commotion and found the two CID officers in a physical altercation with the guard. *Id.* The CID officers said they had been assaulted by the guard, who then resisted when they attempted to arrest him. *Id.*

Rogers helped handcuff the guard, after which the Parchman Superintendent entered the room and said he was leaving with the detained guard. *Id.* Rogers said that the guard was a suspect and could not leave; Rogers then left to call his supervisor. *Id.* At that point, the Superintendent and one of the

CID officers began a physical altercation. *Id.* Subsequently, the Superintendent pursued a criminal assault charge against the CID officer. *Id.* Rogers was subpoenaed by the CID officer to testify at a probable cause hearing on March 13, 2017. *Id.* at 311. At the hearing, he testified to the chain of events that led to the final altercation between the CID officer and the Superintendent. *Id.*

2    On a parallel track, Rogers contacted the FBI to report that he thought his superiors were attempting a "cover-up" of the assault of the inmate, and he sent documents to an FBI agent three days before he testified in the assault case against the CID officer. *Id.* In May or June of 2017, his supervisors contacted him expressing displeasure with his contacts with the FBI and asking for a "synopsis" of his interactions with them. *Id.* Rogers was fired on June 23, 2017. *Id.* He appealed his termination to the Mississippi Employee Appeals Board, which found that his termination was a result of reporting the inmate assault investigation to the FBI and ordered the Mississippi Department of Corrections (MDOC) to reinstate Rogers. *Id.* But Rogers declined reinstatement and brought a § 1983 suit alleging that his supervisors violated his First Amendment rights by terminating him for communicating with the FBI and testifying at the probable cause hearing. *Id.* at 311 n.5.

After defendants filed a summary judgment motion, Rogers conceded that the testimony was the only basis for a potential First Amendment violation. *Id.* The district court then granted the summary judgment motion as to the testimony, concluding that Rogers failed to show that testifying in court proceedings was outside his "ordinary job responsibilities," because it was "axiomatic" that testifying was part of a law enforcement officer's duties. *Id.* at 312. As a result, he could not claim the protection of *Lane*, and he failed to rebut the qualified immunity defense asserted by the MDOC supervisors. *Id.*

13

Our court affirmed the district court's judgment, holding that while Rogers's case "comes close to *Lane*," the uncertainty in the law was fatal for overcoming qualified immunity. *Id.* at 313. The panel majority held that Rogers' testimony "fit squarely" within the question the Supreme Court failed to address—whether an individual who testifies as part of their "ordinary job duties" can claim First Amendment protection for such activities—because it "may have fallen outside" his normal work duties as the altercation between two colleagues was not part of his "main investigation." *Id.* at 313-14. But because Rogers did not introduce evidence showing his testimony was "undisputedly outside the scope of his ordinary job responsibilities," and because the law was not clearly established as to the open issue from *Lane*, he could not overcome the defendants' qualified immunity defense. *Id.* at 314.[3]

The story does not end after *Rogers*. In 2024, following oral argument in Hamilton's appeal, our court revisited Bevill's case on summary judgment. The court did not disturb our previous ruling that Bevill "spoke as a citizen, rather than as an employee" when he wrote his affidavit, but did consider the previously unaddressed issue of whether he spoke on a matter of public concern. *Bevill v. Wheeler*, 103 F.4th 363, 375 (5th Cir. 2024) (*Bevill II*). We found that he did: though he wrote the affidavit to help his friend, his affidavit "nevertheless addressed 'a subject undoubtedly of public concern'"—the potential collaboration between the sheriff, DA, and judge. *Id.* at 376-77. And we gave "decisive[]" weight to the fact that his speech was in the form of an affidavit. *Id.* at 377. That it was "in the context of a well-publicized judicial proceeding" supported the district court's holding that Bevill spoke on a matter of public concern when he submitted the affidavit. *Id.*

_____

[3] Judge Costa dissented from the *Rogers* panel majority.

*Rogers* and the *Bevill* opinions exist in tension with each other. Rogers gave sworn testimony upon a subpoena about an event that he witnessed at work; Bevill volunteered to provide a sworn affidavit in a friend's criminal trial based on misconduct he said he had witnessed at work. Both gave their testimony against the wishes of their superiors. But this court reached opposite outcomes on whether these acts were clearly constitutionally protected: the *Bevill I* panel majority relied on the *Garcetti* formulation of "official duties," observing that "[a]lthough *Lane* added 'ordinarily' to the formulation used in *Garcetti . . .* , we have since noted that, whatever change in the jurisprudence 'ordinary' may augur, we are unable to discern any change in *Garcetti*'s rule from *Lane.*" *Bevill I*, 26 F.4th at 276 n.2 (quoting *Gibson v. Kilpatrick*, 773 F.3d 661, 669 (5th Cir. 2014)) (cleaned up). Based on this premise, the court simply considered whether Bevill had prepared the affidavit at issue in service of his employer—it did not consider whether Bevill normally prepared affidavits of any kind or whether police officers normally provide testimonial evidence in court. *Id.* at 276. *Rogers*, however, adopted the assumption that giving sworn testimony was within Rogers's "ordinary job duties" *because* he was a law enforcement officer, and pointed out that Rogers failed to produce record evidence to the contrary. *Rogers*, 46 F.4th at 314. *Bevill I* predates *Rogers*, and it is also supported by the precedent of this court. *See Gibson*, 773 F.3d at 669; *see also Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016) ("Howell asserts that it was never part of his normal job duties, secretly and without departmental authorization, to aid in an FBI investigation of coworkers and superiors, much less to record surreptitiously coworkers' conversations at the FBI's request. The defendants offer no evidence to the contrary, other than the all-encompassing, judicially established general description of a police officer's professional responsibilities in the state of Louisiana, which, as we have stated, cannot be considered dispositive.").

V

While the district court relied on *Rogers* to reach its decision, we would reach the same outcome regardless of whether the *Bevill* decisions or *Rogers* controlled our analysis of the first prong of *Garcetti*. We need not resolve the tension between *Rogers* and *Bevill* today. Even if Hamilton had engaged in speech protected by the first prong of *Garcetti*, "[a] public employee's sworn testimony is not categorically entitled to First Amendment protection simply because it is speech as a citizen on a matter of public concern." *Lane*, 573 U.S. at 242. If a plaintiff clears that bar, "[t]he question becomes whether the government employer had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 413 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

The Court in *Lane* pointed to factors recognized by *Connick* as legitimate reasons the government might have for treating an employee differently, including "promoting efficiency and integrity in the discharge of official duties" and "maintaining proper discipline in public service.'" 573 U.S. at 242 (citing *Connick v. Myers*, 461 U. S. 138, 150-51 (1983)). In *Lane*, the Court held that the defendant had not made any such showing, submitting "no evidence, for example, that Lane's testimony . . . was false or erroneous or that Lane unnecessarily disclosed any sensitive, confidential, or privileged information while testifying." *Id.*

In this instance, Hamilton's own pleadings demonstrate that he is not entitled to relief under *Garcetti*. Although there is, as in *Lane*, no evidence that Hamilton perjured himself, the *Connick* factors of "promoting efficiency and integrity in the discharge of official duties" and "maintaining proper discipline in public service" favor the City of Wilmer.

Hamilton included in his own complaint Stringfellow's letter summarizing the reasons why he was dismissed. As an initial matter, the

letter raises some reasons for his firing that are not in the ambit of First Amendment protection—such as not immediately reporting to his supervisor that Lawrence had been arrested, which he admits to in his complaint. The letter also speaks to a number of reasons outside of the content of his testimony—or the fact that he was called to give it—that animated his firing: he testified about an employee without informing the City Administrator or the consulting the City Attorney; he drove a city car to the courthouse; he gave testimony in his uniform; and he testified during work hours but did not take leave. Even if we understood his failure to inform his supervisor or seek advice from the City Attorney before testifying as wrapped up in the First Amendment right of a public employee to testify under a sworn subpoena,[4] the City of Wilmer had "adequate justification" to treat Hamilton differently. *Garcetti*, 547 U.S. at 413. Hamilton used the instrumentalities and uniform of the City's Fire Department to testify during the workday—and thus his positive testimony about Lawrence could have been seen as an endorsement on behalf of the Fire Department rather than merely his personal opinion.

*Lane* is animated by a concern that whistleblowers will be fired from their jobs for reporting misconduct by public officers, and as such its rule is intended to ensure that officials who witness public corruption are not "torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs." 573 U.S. at 241. The concern that the Fire Department or the City has for maintaining public trust if its officers are seen as testifying in support of employees who surreptitiously filmed their colleagues in the

---

[4] For example, the *Bevill I* panel majority found that the plaintiff's failure to tell his supervisors that he was filing an affidavit on a friend's behalf, in violation of city policy, demonstrated he "could not have acted for the benefit and subject to the control of his employer" because in doing so "he engaged in speech against his employer's interest." *Bevill I*, 26 F.4th at 278.

bathroom does not trigger the same kind of constitutional scrutiny. Stringfellow's stated reasons for firing Hamilton fall squarely within the *Connick* factors describing legitimate reasons for treating an employee differently. Hamilton's claims cannot overcome the second prong of *Garcetti*. Because Hamilton has pleaded no underlying constitutional violation, the district court's dismissal of the claims against Stringfellow and the City of Wilmer was proper.

## VI

Finally, Hamilton appeals the district court's denial of his request for leave to amend his complaint to plead that he "had never previously provided sworn testimony in his entire career."

After a party's initial 21-day period to amend its complaint following service has passed, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Courts generally review a district court's denial of leave to amend for abuse of discretion. *Flores v. Stephens*, 794 F.3d 494, 504 (5th Cir. 2015) (internal citation omitted). But where "the district court's denial of leave to amend was based solely on futility, we apply a de novo standard of review identical, in practice, to the standard used for reviewing a dismissal under Rule 12(b)(6)." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010) (citing *Wilson v. Bruks-Klockner, Inc.*, 602 F.3d 363, 368 (5th Cir. 2010)).

In this instance, Hamilton did not attach an amended complaint to his motion for leave to amend, as is traditionally required, but he indicated in his motion that he "stands ready to replead . . . as to additional facts . . . that he had never previously testified under oath in Court in his entire career as a firefighter and Fire Chief." The district court denied this motion, holding that "taking the Complaint's well-pleaded facts as true . . . such additional

pleadings regarding Hamilton's purported lack of prior testimony under oath would, nevertheless, result in the same outcome of dismissal."

As the district court noted, Hamilton himself alleged that "when a chief of a fire department is subpoenaed as 'Chief' by the State of Texas' subpoena, then that means he is understood to be testifying as the Chief of the Fire Department, and not as a civilian." In his own pleading, then, Hamilton claimed that he testified pursuant to his official duties. And even if Hamilton re-pleaded that he spoke "as a civilian" and that testifying was not part of his ordinary job duties, he would not prevail on his First Amendment claim under the second prong of the *Garcetti* test. The district court did not err in finding an amendment would be futile.

* * *

Accordingly, we AFFIRM the judgment of the district court.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in part and concurring in the judgment:

I agree with the panel's judgment, but I can only join part of its opinion.

\*

Let's start with three points of agreement.

*First*, I agree we should focus on the First Amendment rather than qualified immunity. As I recently explained, I am unsure "whether and to what extent qualified immunity should apply" outside the context of "split-second" decision-making. *Villarreal v. City of Laredo*, 134 F.4th 273, 277 (5th Cir. 2025) (Oldham, J., concurring). This case did not involve split-second decision-making: Stringfellow had all the time in the world "to consult counsel" and "to investigate all the facts" before deciding whether to fire Hamilton. *Ibid.* So I am unsure whether and to what extent qualified immunity should apply.

*Second*, I agree that Hamilton failed to state a First Amendment claim. If a government employer "ha[s] an adequate justification for treating [an] employee differently from any other member of the general public," then the employee has no First Amendment claim. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Here, the government employer "had an adequate justification for treating" Hamilton "differently from any other member of the general public." *Ibid.* So Hamilton has no First Amendment claim.

*Third*, because that resolves the case, I agree that the district court's judgment should be affirmed.

\*

But there is one part of the panel's opinion I cannot join. I cannot join the panel's *dicta* about *Bevill v. Fletcher*, 26 F.4th 270 (5th Cir. 2022), and

*Rogers v. Hall*, 46 F.4th 308 (5th Cir. 2022). The panel spends eight pages meandering through our precedent interpreting *Lane v. Franks*, 573 U.S. 228 (2014). Then, at the last minute, the panel concludes it does not matter. *See ante*, at 16 ("[W]e would reach the same outcome regardless of whether the *Bevill* decisions or *Rogers* controlled our analysis of the first prong of *Garcetti*."). Respectfully, I would omit this *dicta*.